IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 27, 2012 at Knoxville

## JOE M. GILBERT v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Williamson County**
**No. CR046406     Robbie T. Beal, Judge**

**No. M2012-01440-CCA-R3-PC - Filed January 15, 2013**

A Williamson county jury convicted the Petitioner, Joe M. Gilbert, of aggravated child abuse in 2006, and the trial court sentenced the Petitioner to fifteen years in prison. In 2012, the Petitioner filed a *writ of error coram nobis*, which the trial court dismissed without a hearing after finding that *coram nobis* relief was not applicable to the Petitioner's claim. The Petitioner appeals, claiming that the trial court erred by summarily dismissing the petition without an evidentiary hearing. After a thorough review of the record, the briefs, and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Joe M. Gilbert, Nashville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Kim Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION
### I. Background

In 2006, a Williamson county jury convicted the Petitioner of aggravated child abuse of a child under the age of six, and the trial court sentenced him to serve fifteen years in prison. The Petitioner appealed, and this Court affirmed his convictions. *State v. Joe M. Gilbert*, No. M2007-00260-CCA-R3-CD, 2008 WL 941801 (Tenn. Crim. App., at Nashville, April 8, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008).

On direct appeal, this Court summarized the facts presented at the Petitioner's trial as follows:

The defendant's ex-wife, Terri Gilbert, testified that on the date of the victim's injuries, December 9, 2004, the [Petitioner] worked part-time on weekends at a golf course. During the work week days, the [Petitioner] took care of [ ], the victim, and Ms. Gilbert took their then-two-year-old daughter to a day care center. On December 9, the [Petitioner] called Ms. Gilbert at work and told her he had fallen while holding the victim and thought that the victim might have hit his head. The [Petitioner] told her that the victim had lost consciousness but was revived by the [Petitioner]'s CPR efforts. Ms. Gilbert urged the [Petitioner] to call a doctor. The [Petitioner] called Ms. Gilbert after he had called Harpeth Pediatrics. The [Petitioner] assured her that the nurse at Harpeth Pediatrics had said that the victim should be watched but, in the absence of twitching or other unusual behavior, there was no immediate concern. Ms. Gilbert returned home at 6:00 p.m. and examined the victim. She noticed twitching in his eyes and limbs. Ms. Gilbert took the victim to Williamson Medical Center, and he was then transported by ambulance to Vanderbilt Hospital. The victim was placed in the pediatric intensive care unit for one week and was later moved to a room for a week. He was discharged after being fitted with a feeding tube, which was utilized for nine months. Ms. Gilbert stated that, although the victim was nineteen months old at the time of trial, he was not developing on a normal basis. The victim only began crawling at sixteen months and could not pull up to his feet, stand, or walk. Ms. Gilbert and the [Petitioner] were divorced prior to the [Petitioner]'s trial.

Lisa Albonetti testified that she was a registered nurse employed at Harpeth Pediatrics. Her duties involved supervision of seven other nurses and serving as the telephone triage nurse. As a triage nurse, she was trained to identify potential problems by asking appropriate questions and to give necessary precautions or referrals. Ms. Albonetti recalled talking with the [Petitioner] on December 9. The [Petitioner] told her that he had been feeding the victim a bottle when he got up in response to his telephone ringing. The [Petitioner] tripped over their dog and fell while holding the victim. After relating these events, the [Petitioner] then essentially was silent. In response to Ms. Albonetti's questions, the [Petitioner] denied that the victim hit his head, lost consciousness, vomited, or ceased breathing. She explained symptoms for the [Petitioner] to watch for and instructed him to call back if any of the symptoms surfaced.

Dr. Ida Yared, a licensed pediatrician who, in addition to her practice, also teaches medical students, testified that she was a member of the Vanderbilt Pediatric Care Team. The Care Team is made up of pediatricians and includes social workers who evaluate children suspected of non-accidental injury. On December 9, Dr. Yared examined the victim, discussed his injuries with other treating physicians, and examined x-ray findings. Dr. Yared also spoke with the [Petitioner]. The [Petitioner] told her that he tripped over the dog when he got up to answer the telephone. The [Petitioner] stated he was carrying the victim when he fell and, in falling, may have hit the chair. The [Petitioner] did not say he had shaken the victim but said he had "wiggled" the victim during the victim's distress. Dr. Yared testified that, based on CT Scan and MRI imaging, the victim had extensive injuries that were not consistent with the accident described by the [Petitioner]. The tests showed bleeding in areas around the brain and the appearance of bruising in some areas of the brain. The victim also suffered retinal hemorrhages and seizure activity. Dr. Yared opined that the extensive injuries received would not have resulted from the fall as described by the [Petitioner]. She testified that, to a reasonable degree of medical certainty, the injuries were caused by vigorous shaking of the victim which caused the victim's head to suddenly accelerate and then decelerate. Such motion causes tearing of small veins attaching the brain and skull and consequential bleeding. Dr. Yared stated that these injuries can occur in the absence of shaking and gave examples of an automobile accident or a "very dramatic fall." She stated that she was "one hundred percent certain" that the victim's injuries did not relate to the victim's premature birth. Dr. Yared stated that, among victims of Shaken Baby Syndrome, there is a 25% mortality rate and that 50% of survivors will have some significant impairment such as paralysis, delayed development, or blindness.

Dr. Jennifer Myers, who had been the victim's pediatrician at Harpeth Pediatrics, testified that the victim was born at thirty-five weeks, was treated for a Group B strep condition, and was sent home after ten days in the hospital. An ultrasound at that time showed the victim to be normal. Dr. Myers had seen the victim on five occasions since his injuries on December 9, 2004. She noted that he was not visually tracking objects or blinking. The victim's developmental skills were significantly delayed. At age nine months, he had poor truncal strength, his head "lagged" if picked up. At the age of twelve months, the victim could not pick up small objects and was not creeping or crawling. She stated that the victim will probably have a learning disability and possibly may never walk.

Dr. Deron Sharpe, a specialist in pediatric neurology at Vanderbilt Medical Center, became involved in the victim's treatment due to the seizures. Dr. Sharpe testified that the hemorrhaging of the brain can exert pressure and can cause continuing injury. For treatment and to prevent secondary injury, the victim was given phenobarbital to create a medically-induced coma. In explaining Shaken Baby Syndrome, Dr. Sharpe testified that shaking a baby's body can cause the head of the baby to acquire a high velocity due to the "relatively floppy neck" of infants. This creates internal injuries due to nerves within the brain pulling apart, often accompanied by subdural, epidural, or subarachnoid hemorrhages and retinal hemorrhages. These internal injuries are disproportionate to the traumatic injuries exhibited on the outside of the head. Dr. Sharpe stated that, in his opinion, the victim's injuries were caused by shaking. He further opined that it caused a substantial risk of death and that the victim will likely suffer from neurological impairments. Relying on statistics, Dr. Sharpe stated that these impairments could include mental retardation, severe behavioral manifestations as a teenager, motor deficits, epilepsy, and visual impairment.

Detective Steve Cretin of the Spring Hill Police Department was contacted by a social worker at Vanderbilt Medical Center on December 10, 2004. He spoke with the victim's parents separately at Vanderbilt. The [Petitioner] told Detective Cretin that he had fallen over the family dog while holding the victim. The [Petitioner] said the victim began crying, and he placed the victim on the changing table to examine him for injuries. The victim began vomiting from the mouth and nose and stopped breathing. The [Petitioner] said he was able to revive the victim by using CPR. After this, the [Petitioner] carried the victim to a staff meeting at his part-time employment, Kings Creek Golf Club. When the victim showed signs of agitation, the [Petitioner] left the staff meeting and returned home. The [Petitioner] then called his wife and told her about the falling incident. The [Petitioner] told Detective Cretin that he had called a nurse at Harpeth Pediatrics and related the events, including the vomiting and unconsciousness of the victim. The [Petitioner] said the nurse advised him to watch for any twitching and, if seen, to take the victim to the emergency room.

On December 14, Detective Cretin, with Detective Adrian Breedlove, interviewed the [Petitioner] again, utilizing DVD recording equipment. The redacted interview was shown to the jury. The [Petitioner] first related how he had fallen while holding the victim. The [Petitioner] said he had a staff meeting at his place of employment at 10:00 a.m. He stated that he rose from

a chair in response to either the telephone or microwave oven signal. He fell over the dog, then against the chair, finally to the floor. The victim began to cry loudly. The [Petitioner] placed him on the changing table, and the victim began vomiting from his nose and mouth. The [Petitioner] cleaned the vomit using a suction bulb, but the victim stopped breathing and became limp. The defendant revived the victim using CPR and cleaned him. He said the victim seemed alert, and he dressed him and went to the staff meeting. He stayed only about five minutes due to the victim's "fussing" noises. The [Petitioner] said he called his wife, who urged him to call their doctor. He spoke with a nurse, Lisa, at Harpeth Pediatrics. The [Petitioner] said he related the victim's episode of vomiting and loss of consciousness. The [Petitioner] said he fed the victim about three times that afternoon, and the victim slept intermittently. Ms. Gilbert returned home at six that afternoon. She noticed the victim twitching and carried him to Williamson County Hospital emergency room. The victim was then transported to Vanderbilt Medical Center by ambulance.

In response to the detectives' questions, the [Petitioner] admitted that, in December of 2004, a lack of income had been stressful on his household as his wife had only recently obtained employment. After more confrontational questioning, the [Petitioner] admitted that he was scared. The [Petitioner] admitted that he shook the victim but denied that it was out of anger. He said that he shook the victim to try to revive him from unconsciousness. The [Petitioner] said he panicked and may have shaken the victim for half a minute. The [Petitioner] insisted that he had fallen with the victim and that he shook him afterwards. When asked if the shaking took place on the floor, the [Petitioner] responded:

> No. He was crying. I picked him up trying to pacify him, he was crying more and more and more and more, and then I shook him. And then I shook him again after he was unconscious just trying to revive him. And then I got my wits together enough to save him.

The [Petitioner] said that he lied about not shaking the victim and explained as follows:

> Well, the fact that I shook him after we fell, you know, he wouldn't stop crying and I shook him and that's what made him get sick and lose his breath and I ended up having to do all the other stuff to get him back and shaking him in between too.

-5-

At another point in the interview, the [Petitioner] stated that he shook the victim while holding him by his feet. He said that the victim's head "flopping back and forth" concerned him.

Dax Dunn, a pediatric optometrist, testified on the [Petitioner's] behalf. He stated that he conducted a routine exam on the victim on November 9, 2005. He did not detect any signs of retinal hemorrhaging nor signs of trauma to the victim. On cross-examination, he admitted that retinal hemorrhaging eleven months before should have been resolved at the time of his examination. He further stated that he could not state whether or not the victim had suffered from Shaken Baby Syndrome.

The [Petitioner] testified at trial and again related that he fell while holding the victim and had to revive him from unconsciousness. The [Petitioner] insisted that he did not knowingly or intentionally cause the victim's injuries. On cross-examination, the [Petitioner] accepted responsibility for the victim's injuries sustained while he was in his care. The [Petitioner] further stated that he must have shaken the victim but did not recall how it happened.

*Gilbert*, 2008 WL 941801, at *1-4.

On April 11, 2012, the Petitioner filed a petition for *writ of error coram nobis*, to which the State filed a response. In his motion, the Petitioner asserted that there existed new evidence which established his innocence.

The Petitioner asserted that he learned in October 2011 that the prosecuting officer in his case was dismissed from the police department in June 2006 for conduct unbecoming a police official.[1] The Petitioner claimed that this information should have been made known to the trial court and his attorney so that "these allegations" could have been presented and disputed during his motion for new trial. The Petitioner argued that the State was aware of the officer's dismissal and failed to notify the Petitioner. He stated that this information "could have potentially changed the outcome of the case" as to the credibility of this officer.

---

[1] Articles attached to the Petitioner's brief indicate that a thirteen-year-old girl alleged that the officer, while in Florida attending a training, approached her and made inappropriate comments. The girl reported the comments to security. Police officers investigating the charges were unable to charge the officer and the officer denied making any inappropriate statements to the thirteen-year-old girl.

The trial court denied the petition without a hearing. In its written order, the trial court found that "the allegations made by the Petitioner in this cause against one of the arresting officers [do] not constitute new evidence and would have limited, if any, potential affect on the outcome of the trial of this matter."

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that there is new evidence that was unavailable to him that he could have used to challenge his conviction in a motion for new trial and also on direct appeal. The Petitioner asserts that the discovery of the officer's termination required an evidentiary hearing on his claims. The State responds that because this evidence is not "new," was not unavailable to the Petitioner, and is not evidence that may have led to a different result, the trial court properly dismissed the petition. We agree with the State.

A *writ of error coram nobis* is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2009). The statute governing coram nobis relief provides that relief under its provisions only lies for newly discovered evidence "relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105 (2009).

The decision to grant or to deny a petition for the *writ of error coram nobis* on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). A *writ of error coram nobis* is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

The grounds for seeking a petition for *writ of error coram nobis* are not limited to specific categories, as are the grounds for reopening a post-conviction petition. *Coram nobis* claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. *Coram nobis* claims therefore are singularly fact-intensive. Unlike motions to reopen, *coram nobis* claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).

"Similar to habeas corpus hearings, *coram nobis* evidentiary hearings are not mandated by statute in every case." *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *6 (Tenn. Crim. App., at Jackson, Dec. 13, 2006) *no Tenn. R. App. P. 11 application filed*. A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing' if the petition does not allege facts showing that the petitioner is entitled to relief." *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

We first note that the petition was not timely filed. *Coram nobis* claims are subject to a one-year statute of limitations that is computed from the date the judgment of the trial court becomes final. T.C.A. § 27-7-103 (2009); *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn.1999). The Petitioner was convicted in 2006 and he filed his *coram nobis* petition in 2012.

Further, the Petitioner has failed to show that the evidence is "newly" discovered, was unavailable to the Petitioner at the time of his trial, and may have resulted in a different judgment at his trial. The documents attached to the petition in support of the Petitioner's claim document media coverage of the allegations against the officer in June 2006, undermining the Petitioner's assertion that this evidence is "new."

The Petitioner has also failed to show that evidence of the officer's alleged conduct may have resulted in a different judgment. Evidence of the officer's alleged unprofessional conduct serves no purpose other than to impeach the officer's credibility. As this Court stated in *State v. Hart*, evidence that serves no purpose other than to contradict or impeach "will not justify the granting of a petition for the *writ of error coram nobis* when the evidence, if introduced, would not have resulted in a different judgment." 911 S.W.2d at 375. Even if the Petitioner had impeached the officer's credibility with the allegations of unprofessional conduct, the jury still viewed the Petitioner's videotaped confessions to repeatedly shaking his baby and medical testimony supporting the tragic result of such conduct. The Petitioner has failed to show how the prosecuting officer's allegedly inappropriate comments to a minor

in Florida may have changed the result of the Petitioner's trial or sentencing hearing.

Accordingly, because the Petitioner failed to present facts in his petition that entitle him to *coram nobis* relief, the trial court did not err in summarily dismissing the petition. Therefore, the Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE